UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

- - - - - - - - - - -

UNITED STATES OF AMERICA,

           Plaintiff,                   No.    1:03-CR-239

v.                                       Hon.   Gordon J. Quist
                                              U.S. District Judge

NORMAN DAVID SOMERVILLE,

           Defendant.
_____/

## **GOVERNMENT'S SENTENCING MEMORANDUM**

NOW COMES the United States of America by Margaret M. Chiara, United States Attorney for the Western District of Michigan, and Lloyd K. Meyer, Assistant United States Attorney, to advocate a sentence that will reflect the seriousness of a violent crime committed by an armed and dangerous man who shows little hope of rehabilitative potential. As set forth below, Defendant Norman David Somerville possessed and distributed machineguns and ammunition in connection with such other felony offenses as growing marijuana and unlawfully threatening to assault protected federal officials. Shortly after his plea hearing he repeatedly attempted to obstruct justice and has not manifested acceptance of responsibility for his offenses. The Court should sustain the Probation Officer's recommendations for these guideline enhancements and consider an upward departure given the number of machineguns involved, notwithstanding the Defendant's objections.

## FACTS

**Before his arrest on October 10, 2003, Defendant Norman David Somerville was
filled with hate while stockpiling guns and ammunition for violent acts.**

The facts leading up to the arrest of Defendant Normand David Somerville are
detailed in ATF Special Agent Mark Semear's affidavit in support of a search warrant
(WD MI Case No. 1:03-M-371) and the Presentence Investigation Report, ¶¶ 17 - 21 at
4 - 5.

Defendant Norman David Somerville, a 43-year-old resident of Mesick, Michigan,
was growing marijuana and stockpiling an anti-aircraft gun, machineguns, explosive
powder, bomb-making materials, automatic assault weapons and tens of thousands of
ammunition rounds on his 40-acre compound in Wexford County.  According to his close
associates, Defendant Somerville was filled with rage and spoke of his plants to ambush
people, mowing them down in a hail of machine gun bullets.

On July 18, 2003, the Michigan State Police (MSP) contacted the ATF Grand
Rapids Field Office regarding the investigation of Defendant Norman David Somerville
and his girlfriend.  In July 2003, a named and identified confidential source had
approached the MSP with information that Defendant Somerville, his girlfriend and a few
others were members of a self-styled radical militia unit who were very upset about the
death of Mr. Scott Woodring.[1]  According to the source, Defendant Somerville was

_____

[1]Mr. Woodring was killed by Michigan State Police officers on Sunday, July 13,
2003, just a few miles from his Newaygo County home.  Mr. Woodring became the
subject of an intense week long manhunt after murdering Michigan State Trooper Kevin

heavily armed with machineguns and wanted to kill a MSP trooper to avenge Mr.

Woodring.  According to the source, Defendant Somerville's property was protected by

an anti-aircraft weapon and .30 caliber machineguns.  The source stated that Defendant

Somerville was expecting and planning for a fight; that he held degrees in physics,

computer science and economics; and that he had at one time been part of a Special

Forces military unit.

As a result of the information from this source, law enforcement determined that

previously:

- On December 16, 2000, the MSP interviewed Defendant Somerville as a witness to a domestic assault.  At this time Defendant Somerville was living in Mancelona.  The MSP Trooper asked if he was the person who had received a shipment of 5,000 rounds of .50-caliber ammunition last summer.  Defendant Somerville stated that was correct.  The Trooper asked Defendant Somerville why he had set up a sand bag bunker.  Defendant Somerville stated that he was angry because one of the other Troopers had arrested his neighbor, and the officer had made threats, and he did not like anybody coming into his neighborhood making threats.  The Trooper stated that law enforcement is required to arrest people on warrants signed by the judge and that he should not shoot the messenger.  Defendant Somerville stated "that's why no one died that day."

- Additionally, on April 29, 2001, Michigan Department of Natural Resources (DNR) Conservation Officers (CO) Michelle Wiegand and Steve Converse responded to a complaint of poaching in the area of M-42 and N. 21 Road.  The rapid fire shooting of heavy caliber weapons in the area concerned property owners in the area.  The officers entered the property

---

Marshall and escaping.  Mr. Woodring shot Trooper Marshall during a standoff after police officers attempted to serve the 40-year-old radical militiaman with a court warrant for criminal sexual conduct.  When Mr. Woodring was found by police officers sleeping in his car, he ignored orders to come out with his hands up and aimed an assault rifle at police.

and encountered Defendant Somerville and his girlfriend as well as other unidentified subjects. The DNR officers explained to Defendant Somerville that they had permission to use the property by the owner in order to curtail illegal hunting activities. Defendant Somerville allowed the officers to take information from the weapons that his party was firing on the property. These firearms included a Browning, M2, .50 caliber, semi-automatic gun on a tripod, serial number 1647797, a Browning, .30 caliber, semi-automatic gun on a tripod, serial number 564438 (officers did not know the model of this firearm), two FN, L1A1, Sporter 308, .308 caliber, serial numbers A34441 and 124471. The officers did not fire the weapons or fully examine them so they took Defendant Somerville's word that the firearms were semi-automatic.

- Sometime after September 11, 2001, Defendant Somerville moved onto his 40-acre property in Antioch Township making it his residence.

- On August 7, 2003, the ATF received copies of Defendant Somerville's U.S. Army Service Record. According to this record Defendant Somerville served in the U.S. Army from September 19, 1978, to February 10, 1984. Defendant Somerville was an enlisted person trained as an intelligence analyst. From April 13, 1979, to November 18, 1980, he was assigned to the 7th Special Forces Group (SFG) at Ft. Bragg, NC, and from October 17, 1981, to March 1, 1982, he was assigned to the 11th SFG at Ft. Meade, MD.

In September 2003, MSP Detective Mark Henschell was contacted by his source who said that Defendant Somerville was attempting to mount one of his M1919A3 machineguns into a Jeep. Defendant Somerville wanted to cause an auto accident, then, when law enforcement officers arrived on the scene, he planned to ambush and kill them. The law enforcement source has known Defendant Somerville for several years and was one of several trusted associates who have knowledge and observation of Defendant Somerville's property. The source was afraid that Defendant Somerville had become mentally unbalanced and would kill an innocent person or be killed. This source stated that Defendant Somerville rarely left the property. Within his property Defendant

4

Somerville kept several loaded firearms and also hid loaded firearms on other parts of the property.  Defendant Somerville had an outbuilding with a metal lathe and other machining tools he used to modify firearms.  Defendant Somerville had also dug out an underground bunker large enough to test fire firearms.  Defendant Somerville called this area "the laboratory."  The purpose of this was to fire machineguns without being heard by the neighbors.  Defendant Somerville had a smaller camping trailer that was loaded with about one hundred pounds of black powder.

The ATF determined that the Browning, M2, .50 caliber that the DNR saw was a firearm that Defendant Somerville had purchased legally though a Federal Firearms Licensee (FFL) in Kalkaska, as a semi-automatic.  The ATF feared that since that time Defendant Somerville had obtained additional parts to convert this M2 into a machinegun.  The source stated that this .50 caliber gun was mounted on an anti-aircraft mount that was hidden in the tree line near his house under a tarp.

The source stated that Defendant Somerville had ordered enough parts kits to manufacture numerous M1919A3, .30 caliber machineguns.  Defendant Somerville had to manufacture additional parts including side plates to complete the machineguns.  The source stated that Defendant Somerville and his girlfriend riveted the side plates to the machinegun.  The source witnessed the machineguns fire fully automatic.  Two machineguns were in a brown van also loaded with supplies and ammunition.  One machinegun was being mounted in a Jeep.

5

Defendant Somerville also purchased two kits to make Browning M2, .50 caliber machineguns.  The source stated that Defendant Somerville was working on one of the M2s but did not know if it was functional yet.  The source stated that Defendant Somerville also had four Fabrique Nationale (FN) L1A1 rifles.  The source stated that at least two of these rifles had been converted to fire fully automatic and had witnessed Defendant Somerville and his girlfriend fire them fully automatic.

According to the source, Defendant Somerville and his girlfriend had marijuana plants growing near the residence for their own use.  The source stated that Defendant Somerville smoked marijuana on a daily basis, often several times a day and that his girlfriend also smoked marijuana.

The source stated that Defendant Somerville had at least 45,000 rounds of linked .50 caliber ammunition for the anti-aircraft weapon as well as a large stockpile of other calibers of ammunition.

### Federal law enforcement authorities plan for the peaceful arrest of Defendant Somerville

In the Fall of 2003 this confidential source was compelled to be identified and testify under oath before the federal grand jury in Grand Rapids to provide information about the crimes of Defendant Somerville.[2]  Subject to the penalties of perjury, the source

---

[2]Before testifying, the source declared that the source would testify truthfully, by oath administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so.  See Fed. R. Evid. 603..  "In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at

testified consistent with the information provided to law enforcement.  Citizens sitting on a federal grand jury in Grand Rapids then returned a three-count indictment charging Defendant Norman David Somerville with unlawful possession of a machinegun, being an unlawful user of marijuana in possession of firearms and manufacturing marijuana.

United States Magistrate Judge Joseph G. Scoville then found probable cause to believe that Defendant Norman David Somerville was growing and smoking marijuana and stockpiling machineguns, destructive devices and semiautomatic assault weapons on a 40-acre compound in Wexford County.  Judge Scoville then commanded ATF agents to search for and seize from the property marijuana, drug paraphernalia, machineguns, illegal firearms, ammunition, and related records, documents and other personal property that constituted evidence of the commission of several criminal offenses, things criminally possessed or property designed or intended for use or which was or had been used as the means of committing criminal offenses.

The ATF and MSP had already conducted considerable planning and preparation to arrest Defendant Somerville peacefully and search his compound without any danger

---

trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. §6A1.3(a).  Hearsay evidence, which includes grand jury testimony, may be considered if it bears some minimal indicia of reliability.  *See United States v. Mayle,* 334 F.3d 552, 559 (6th Cir. 2003); *United States v. Williams,* 10 F.3d 910, 914 (1st Cir.1993).  In the instant case, the grand jury testimony of the cooperating witness was given under oath and subject to the penalties of perjury, and thus had at least minimal indicia of reliability.  *See Williams,* 10 F.3d at 914. Furthermore, the subsequent court-ordered search of Defendant Somerville's property and his letter writing overwhelmingly corroborate this grand jury testimony.  The district court may properly rely on this grand jury testimony of a crucial, confidential witness whose life would be endangered if the identity were disclosed to Defendant Somerville.

7

of gunfire or a stand off. Law enforcement agents were prepared to wait weeks or months for Defendant Somerville to leave his property unarmed.

Then on October 10, 2003, Defendant Somerville left his compound and was arrested unarmed at a Home Depot in Cadillac, Michigan. For the next two days, law enforcement officers from the ATF and MSP then conducted the court-ordered search.

### Defendant Somerville was indeed an armed and dangerous man.

Law enforcement officers found the 40-acre compound just as the source described. Hidden in a tree line, Defendant Somerville had mounted a maneuverable anti-aircraft gun in a position to command logical fields of fire and approaches to the property and any airline flight paths in the open sky. This M2 .50 caliber gun was over five feet long and weighed more than 150 pounds with tripod with a maximum range of over 4 miles. Defendant Somerville had tens of thousands of belted ammunition rounds for the gun.

Defendant Somerville had several M1919 .30 caliber machineguns, one locked, loaded and ready to go behind the side door of a mobile panel van and another machine gun mountable onto a gun turret installed in a Jeep Cherokee where the passenger seat had been removed. A .30 caliber machinegun is capable of a sustained rate of 400 to 550 rounds per minute with an effective range of one-half mile. Defendant Somerville had thousands of rounds of belted ammunition for these weapons.

The keys to what Defendant Somerville himself described as his "war wagons" were in the ignition, ready to go.

8

Defendant Somerville also had considerable stores of food, hundreds of pounds of gunpowder and marijuana cached on his property.

Agents also found photographs of President Bush and Secretary of Defense Donald Rumsfeld with the cross-hairs of a high-powered rifle scope drawn over their heads. Defendant Somerville was already under investigation by U.S. Secret Service agents who had information that Defendant Somerville had stated over a ham radio that he was going to dispatch assassination teams to target President Bush. Agents found Defendant Somerville's ham radio.

Agents also seized numerous books, publications, and documents, including such military field and technical manuals entitled:

- FM 5-31 *Booby Traps*;

- TM 31-201-1, *Incendiaries*;

- FM 31-21 *Guerrilla Warfare and Special Forces Operation*;

- TM 31-200-1 *Unconventional Warfare Devices and Techniques*;

- FM 23-55 *Browning Machineguns Caliber .30 M1919A6 and M37*;

- *Guerilla's in the Mist, Battlefield Guide to Clandestine Warfare*, by Bob Newman; and

- *Workbench Silencers* by George Hollenback.

There were also such videotapes as *America: Wakeup or Waco*, *29 April 2001 Militia Training* and *9/11, the Road to Tyranny*.

**Defendant Somerville contradicts his statements given to the Court under Oath.**

9

On August 11, 2004, Defendant Somerville appeared before the Court to plead guilty to Count 1 of the Indictment for unlawfully possessing machineguns.  He had signed a plea agreement stating in part:

> **The defendant understands that neither the United States, his lawyer, nor the Court can make a binding prediction of, or promise him, the sentence that ultimately will apply to his case.  The defendant agrees that no one has made such a binding prediction or promise.**

Plea Agreement, VII. D. at 5. (emphasis of bolding and underlining in the original). Moreover, while under oath, Defendant reiterated to the Judge that no one had made such a binding prediction or promise to him regarding his sentence.  He also admitted that his offense involved 13 machineguns.

However, Defendant Somerville then sent a letter to this court stating, "The plea agreement which was signed by me yesterday was not entirely agreeable or accurate . . . Mr. Doele and Mr. Meyer suggested to me a likely sentence of two years . . . I believe his statements to my wife were substantial inducements . . . The language in section VII D, is in my opinion, a bad faith representation of matters that have transpired."

Indeed, at the motion hearing for new counsel on November 17, 2004, this Court stated:

> But what I'm concerned about are some things in your letter which are totally contradictory to what you said to me under oath when you made your plea.  And I'm not going to ask for a response at this time.  But in your letter, I think you acknowledge the fact that they're contradictory . . . I asked you specifically about any promises and about any sentence, and you said, "No."

Motion Hearing for Change of Counsel, November 17, 2004, at 10.

**After his plea Defendant Somerville writes letters compromising an ongoing criminal investigation and expressing an intention to kill.**

Defendant Somerville became a prolific letter writer while awaiting sentencing.

Just a small sample of these letters was filed separately under seal in the Government's

Submission to Supplement Sentencing Record.  In the letters to certain, named persons

Defendant details information acquired by federal authorities in ongoing investigations in

an attempt to obstruct the investigation or prosecution of other individuals:

> You are totally busted . . . you are totally sold out . . . I've given grand jury testimony to name everyone involved in the farm in any way, as well as Christ County members and some Outlaws . . . Everyone who attended the 3/16/02 meeting will be arrested for charged with terrorism over the next 2 or 3 years . . . your arrest will be probably the first . . . We carried bugs into homes, taped hundreds of phone calls, gave hours [of] untold interviews to Federal Agents . . . I was told personally by the head FBI agent involved in this case that getting you off the air is a high priority . . . you have my permission to use this information on your radio show or websites . . . This is a huge backstab so I have decided to return the favor to the feds.  I am awakening all those who will be grabbed next to what will happen to them . . . .

In numerous other letters Defendant states repeatedly variations on the homicidal

themes that he intends to "Kill the Pigs," seek "Blood Revenge," and "butcher" human

beings:

> I am one pissed off fucker . . . I am close to seriously contemplating suicide or killing a guard(s) to escape.  I wish I were dead.  I have been attacked for committing no crime at all.  I am very angry about that.  Death to all the Pigs.  War Now! . . . No matter if a few machineguns get picked up - the vast number of guns remain and those will speak more when they are motivated than the small amount of ammo to feed the full autos.  Snipers will rule the day and night.  Pigs will get popped, Pig by Pig.  Pop Pop Pop. Tyranny will end . . . I am not the criminal.  Weed is not a crime.  Guns are not a crime.  I harmed no one.  Fuck these Pigs . . . If these Pigs, Doele

included, do not get something in writing in a good deal, then I have a ton of revenge to dish out . . . If I get prison time, then it's Jihad for me - when I get out I will have no mercy and no need for any niceness towards them . . . The more I think of it the more I want revenge . . . But bloody revenge will teach these Pigs not to fuck over people who are helping them.  Soon I will go off in here and kill my way out of here.  I don't care about the future anymore.  I want revenge for all these government injustices and real crimes . . . I hate Pigs.  I want [******] butchered.  I want [*******] ripped open and gutted.  I want nukes to go off all over the country on July 4.  I want death and mayhem ass deep in blood and gore.  I had to give up my religious morals because of the federal pig mafia - you know I was crazy before.  But now I have a lot more love of murder . . . bring on the slaughter . . . all this jail time is breeding unending hate in me and I don't care if I die killing Pigs anymore.  I am a genuine victim.  I did nothing . . . .

## DISCUSSION

There is some guideline agreement between the parties.

The parties agree that the Base Offense Level is **20** under U.S.S.G. §2K2.1(a)(4)(B) because the Defendant was a prohibited person who possessed machineguns as defined in 26 U.S.C. § 5845(a).  Defendant's Sentencing Memorandum at 12.

The parties also agree that an increase in **4** levels is appropriate under U.S.S.G. §2K2.1(b)(1)(B) for a specific offense characteristic involving 8 to 24 firearms.[3]  *Id.*

---

[3]This guideline enhancement assumes firearms that are of a type otherwise lawfully possessed.  Here the Defendant admitted under oath at his plea hearing that he initially had 13 machineguns.  An upward departure may be warranted if the offense involved multiple National Firearms Act weapons like machineguns, military type assault rifles or the offense posed a substantial risk of death or bodily injury to multiple individuals.  U.S.S.G. 2K2.1, comment. (n.13).

The parties further agree that an increase of **2** levels is not appropriate under U.S.S.G.§2K2.1(b)(3)(A) because the government cannot meet its burden to show that the offense involved a destructive device as narrowly defined by 26 U.S.C. § 5845(f).  *Id.*

However, there remains substantial disagreement between the parties.

### Defendant Somerville unlawfully possessed his firearms in connection with another felony offense.

Defendant Somerville possessed his firearms and stockpiles of ammunition in connection with other felony offenses, to include growing marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846 and threatening to assault a United States official or federal law enforcement officer with intent to impede, intimidate, or interfere with such official or law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such official or law enforcement officer on account of the performance of official duties in violation of 18 U.S.C. § 115(a)(1)(B).

U.S.S.G. §2K2.1(b)(5) provides for a four-level increase "[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense."  A firearm is used or possessed "in connection with" an offense if the weapon facilitated or potentially facilitated the felonious conduct, or emboldened the defendant during the felonious conduct.  *United States v. Carter,* 355 F.3d 920, 925 (6th Cir. 2004); *United States v. Spurgeon,* 117 F.3d 641, 644 (2d Cir. 1997).  The Sixth Circuit has concluded that the government has established a sufficient connection with a felony drug offense "if it reasonably appears that the firearms found on the premises controlled or owned by a

defendant and in his actual or constructive possession are to be used to protect the drugs .
. . .” *United States v. Henry,* 878 F.2d 937, 944 (6th Cir. 1989).  Further, the "in
connection with" element may be established under the fortress theory by showing a
nexus between weapons and drugs.  *United States v. Hardin,* 248 F.3d 489, 500 (6th Cir.
2001).  A sufficient connection is established under the fortress theory “if it reasonably
appears that the firearms found on the premises controlled or owned by a defendant and
in his actual or constructive possession are to be used to protect the drugs.”  *United States
v. Ennenga,* 263 F.3d 499, 503 (6th Cir. 2001).  The government has the burden of proof
of showing that the guideline applies.  *Hardin,* 248 F.3d at 495.  To succeed on a
challenge to a sentence, the defendant must show that the information before the district
court was inaccurate and that the district court relied upon it. *United States v. Westbrook,*
986 F.2d 180, 182 (7th Cir. 1993).

Here, Defendant Somerville’s 40-acre compound can only be described as a
“fortress.”  He had numerous marijuana plants, the size of small trees, growing on his
property surrounded by gun emplacements, fighting positions, cleared fields of fire,
loaded guns, tens of thousands of rounds of ammunition and food stores.  On one
fortified building he had spray painted the words “Fuck the Pigs” and “Genesis 1:29.”[4]
Defendant can not argue that he would have peacefully relinquished control of his

---

[4]“And God said, ‘Behold, I have given you every herb bearing seed, which is upon
the face of all the earth, and every tree, in which is the fruit of a tree yielding seed; to you
it shall be for meat.’ ”

feloniously grown marijuana had any fellow drug abuser or law enforcement agent intruded. He would have opened fire. The photographs to be shown to the Court at sentencing will show the unintended irony of Defendant's proposition that "[t]his is more of a situation . . . where the firearm is an unloaded hunting rifle located in a closet . . . ." Defendant's Sentencing Memorandum at 5.

Moreover, Defendant Somerville armed himself within the context of threats against protected federal officials. Defendant knowingly threatened to kill protected federal officials with the intent to impede, intimidate or interfere with such officials while engaged in the performance of official duties or with the intent to retaliate on account of the performance of official duties. *See* 18 U.S.C. § 115(a)(1)(B).

In establishing that a threat was made in the context of § 115(a)(1)(B), the question is whether the statement was made under such circumstances that a reasonable person would foresee that the statement would be understood by others as a serious intent to harm another. *United States v. Saunders*, 166 F.3d 907, 912 -914 (7th Cir. 1999); *United States v. Pacione*, 950 F.2d 1348, 1355 (7th Cir. 1991), *cert. denied*, 505 U.S. 1229 (1992); *United States v. Khorrami*, 895 F.2d 1186, 1192 (7th Cir.), *cert. denied*, 498 U.S. 986 (1990).

This objective standard focuses on whether a reasonable speaker would foresee that the recipient of his words would take the statement seriously. *See also, United States v. Schiefen*, 139 F.3d 638, 639 (8th Cir. 1998) (per curiam) (concluding that a reasonable person would foresee that the recipient judge would perceive the language as a threat);

15

*United States v. Fulmer,* 108 F.3d 1486, 1491-92 (1st Cir. 1997) (collecting cases, concluding that "the appropriate focus is on what the defendant reasonably should have foreseen"); *United States v. Orozco-Santillan,* 903 F.2d 1262, 1265 (9th Cir. 1990); *United States v. Welch*, 745 F.2d 614, 619 (10th Cir. 1984), *cert. denied*, 470 U.S. 1006 (1985). *See also United States v. Stevenson*, 126 F.3d 662, 664 (5th Cir. 1997) (stating that the defendant must have communicated his threat intentionally); *United States v. Whiffen*, 121 F.3d 18, 21 (1st Cir. 1997) (adopting *Fulmer*, for interpretation of "threat" under 18 U.S.C. § 875).

Additionally, the government is not required to prove that the defendant actually intended to carry out the threat. *See United States v. Smith*, 928 F.2d 740, 741 (6th Cir.), *cert. denied*, 502 U.S. 852 (1991). The government is not required to show that a defendant has the actual ability to carry out the threat. *See Khorrami*, 895 F.2d at 1192-93; *United States v. Hoffman*, 806 F.2d 703, 708 (7th Cir. 1986), *cert. denied*, 481 U.S. 1005 (1987)).

Finally, at least within the context of an analogous threat communicated to a third-party under 18 U.S.C. § 875(c) there is no requirement that the threat be actually communicated to its intended target for the offense to be complete. *United States v. Morales*, 272 F.3d 284, 287-289 (5th Cir. 2001); *United States v. Myers,* 104 F.3d 76, 79 (5th Cir. 1997), *United States v. Bozeman,* 495 F.2d 508, 510 (5th Cir. 1974).

Defendant Somerville carefully drew the cross hairs of a high-powered rifle on the pictures of President George W. Bush and Secretary of Defense Donald Rumsfeld. His

16

plans and preparations to murder law enforcement officials so concerned a close associate

that the cooperating witness approached authorities and then testified under oath in the

grand jury.  This grand jury testimony was overwhelmingly corroborated by the evidence

found during the court-ordered search of Defendant's property as well as his numerous,

hate-filled letters sent subsequent to his plea hearing.  Reading Defendant's letters and

viewing the pictures of his property, guns and ammunition, the Court can not doubt that if

Defendant had had the chance, he would have surely killed any federal law enforcement

officers ordered by the U.S. Magistrate Judge to search his property.

The Defendant's guns were indeed possessed in connection with other felony

offenses.

17

**Defendant Somerville obstructed justice
in contradicting statements he made to the Court under oath at his plea hearing
and in his attempts to compromise an ongoing investigation.**

Section 3C1.1 of the Sentencing Guidelines provides that:

> If (A) the defendant willfully obstructed or impeded, or attempted to
> obstruct or impede the administration of justice during the course of the
> investigation, prosecution, or sentencing of the instant offense of
> conviction, and (B) the obstructive conduct related to (i) the defendant's
> offense of conviction and any relevant conduct; or (ii) a closely related
> offense, increase the offense level by **2** levels.

The commentary to § 3C1.1 also provides that "providing materially false

information to a judge or magistrate" or "other conduct prohibited by obstruction of

justice provisions under Title 18, United States Code" are examples of conduct that

warrant enhancement under the section.  *See* U.S.S.G § 3C1.1, comment. (n. 4(f) and (i)).

A defendant who lies to a judge about a material fact that, if believed, would tend

to influence or affect the issue under determination warrants an enhancement for

obstructing justice.  *United States v. Turner*, 324 F.3d 456, 460 -461 (6th Cir. 2003);

*United States v. O'Dell,* 204 F.3d 829, 837 (8th Cir. 2000)*; United States v. Moss,* 9 F.3d

543, 553 (6th Cir. 1993); *United States v. Crousore,* 1 F.3d 382, 385 (6th Cir. 1993)  At

the plea hearing the Court put the Defendant under oath and made a thorough inquiry to

ensure that his plea was not improperly induced by false promises from the prosecutor or

his defense lawyer.  Defendant Somerville then wrote a letter to the Court contradicting

the statements he made under oath and, if believed, undermining any confidence that the plea was not improperly induced.  Standing alone, this letter to the Court warrants a two-level enhancement for obstructive conduct.

Further, Defendant Somerville attempted to obstruct an ongoing federal investigation by mailing letters to the targets.  Defendant Somerville first promised to provide extensive cooperation by the terms of his plea agreement.  He had numerous meetings with ATF and FBI agents in which he was able to ascertain the targets and direction of the investigation and the methods by which investigators hoped to gather evidence and build their cases.  He then used this information to attempt to warn others in a detailed letter writing campaign.  *See* Government's Submission to Supplement Sentencing Record.

A defendant may not act to interfere with the investigation and prosecution of crimes.  *See United States v. Perry,* 991 F.2d 304, 312 (6th Cir.1993); *United States v. Whitmore*, 165 F.3d 913, 1998 WL 792296 (4th Cir.(S.C.))(unpublished opinion attached).  A two-level obstruction increase was affirmed for the defendant in *Whitmore* after he acquired a DEA report pursuant to Fed. Crim. P. 16 discovery then released it to warn the community who was being investigated and who was cooperating with authorities.  This is precisely what Defendant Somerville attempted to do.

19

Consequently the Court should increase Defendant's offense level by 2.

Moreover, if the Court finds that Defendant Somerville attempted to obstruct justice, any

decrease for acceptance of responsibility under U.S.S.G. §3E1.1 would be inappropriate.[5]

### Defendant Somerville has not accepted responsibility for his offense and should be accorded no benefit under U.S.S.G. §3E1.1.

U.S.S.G. §3E1.1 provides for a two- or three-level reduction in a defendant's

offense level if the defendant clearly demonstrates an affirmative acceptance of personal

responsibility for his criminal conduct.  It is Defendant Somerville's burden to

demonstrate by a preponderance of the evidence that he is entitled to a reduction for

acceptance of responsibility.  *See United States v. Guthrie,* 144 F.3d 1006, 1012 (6th Cir.

1998).  The mere fact that Defendant Somerville pleaded guilty does not, however,

automatically entitle him to the reduction. *See id.*  A district court may consider many

factors to determine if such a reduction is warranted, including whether the defendant has

voluntarily ceased his criminal conduct.  *See United States v. Childers,* 86 F.3d 562, 563-

64 (6th Cir. 1996).  The Sixth Circuit has held that the "voluntary termination or

withdrawal" factor means that criminal conduct that continues following a guilty plea,

especially when the conduct is of the same type as or related to the underlying offense, is

---

[5]"Conduct resulting in an enhancement under §3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct.  There may, however, be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply."  U.S.S.G. §3E1.1, comment. (n.4).  This is no such extraordinary case.

a significant consideration that will, in almost every instance, make a downward adjustment inappropriate. *See id.*

Here, Defendant Somerville can not meet his burden of establishing that he is entitled to a reduction for acceptance of responsibility. Defendant's extensive letter writing campaign expresses a hatred for law enforcement and an intent to wreak violence, vengeance and death upon law enforcement authorities in general and certain individuals in particular. The Defendant has evidenced no remorse or acceptance of wrongdoing. In his mind he is the victim. The attorney for the government predicts that Defendant's arguments and statements at the sentencing hearing will further show that he falsely denies and frivolously contests relevant conduct that the Court will determine to be true.

## CONCLUSION

The Court should deny Defendant's objections and sustain the Probation Officer's recommendations that Defendant Somerville was a prohibited person in possession of some 13 machineguns along with other guns and ammunition possessed in connection with other felony offenses; he attempted to obstruct justice and has not accepted responsibility for his offense. Thus, the appropriate, advisory guideline range for his total offense level is 30, resulting in a range of imprisonment of 97 to 121 months.

However, the maximum punishment under the offense of conviction is 10 years. Given the nature and circumstances of Defendant Somerville's violent offense involving numerous machineguns possessed by him and distributed to others, his history and characteristics, and the need for a maximum sentence to reflect the seriousness of the

21

offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct and to protect the public from further crimes of an angry, armed and dangerous man, the United States petitions the Court to sentence Defendant Norman David Somerville to 10 years in prison.

Such a 10-year sentence would be fair and just even without the upward departures that the Government moves this Court to consider; namely, 1) that the offense involved multiple National Firearms Act machineguns, U.S.S.G. §2K2.1, comment. (n.13); and 2) that there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2) should result in a sentence different from that calculated for Donald Joseph Koshmider, II, Jeffrey Thomas Horvath, and David Francis Grohman, coconspirators within the heartland who buried their dangerous machineguns and unlike Defendant Somerville did not have them locked, loaded and ready to kill with just the slight pull of a trigger.

Respectfully submitted,

MARGARET M. CHIARA
United States Attorney

Dated:   March 21, 2005           /s/ Lloyd K. Meyer
LLOYD K. MEYER
Assistant United States Attorney
P.O. Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404